# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 22-0602V

| | |
|---|---|
| CARINNA SHARRAK,<br><br>                  Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>                  Respondent. | Chief Special Master Corcoran<br><br>Filed: July 24, 2025 |

*Paul R. Brazil, Muller Brazil, LLP, Dresher, PA,* for Petitioner.

*Meghan Murphy, U.S. Department of Justice, Washington, DC,* for Respondent.

**RULING ON ENTITLEMENT AND DECISION AWARDING DAMAGES**[1]

On June 1, 2022, Carinna Sharrak filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleges that she suffered a Table shoulder injury related to vaccine administration ("SIRVA") resulting from an influenza ("flu") vaccine received on October 12, 2020. Petition at 1. The case was assigned to the Special Processing Unit of the Office of Special Masters (the "SPU").

The parties were unable to resolve the claim on their own, and have now fully briefed entitlement and damages. For the reasons described below, I find that Petitioner is entitled to compensation, and award damages in the amount of **$100,570.00,**

---

[1] Because this Decision contains a reasoned explanation for the action taken in this case, it must be made publicly accessible and will be posted on the United States Court of Federal Claims' website, and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc, in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2018).

**representing $100,000.00 for actual pain and suffering, plus $570.00 for past unreimbursable expenses.**

## I.   Factual Evidence

### A.  Medical Records

On October 12, 2020, Petitioner received a flu vaccine in her left deltoid. Ex. 1 at 3. The following month (November 23, 2020), Petitioner went to urgent care for COVID-19 testing following a positive COVID case in her child's school. Ex. 12 at 7-8. The visit record is titled "COVID-19 TESTING ENCOUNTER." *Id.* She did not report shoulder problems at this time, and no musculoskeletal examination was done. *Id.*

On February 2, 2021 – nearly four months after vaccination – Petitioner saw her primary care provider ("PCP") by telehealth, complaining of left arm pain after her October vaccination. Ex. 2 at 9. After the vaccination, she reported, "she had continued L arm pain for 1.5 months along the upper arm on the L . . .deep and almost to the bone." *Id.* She hoped it would resolve on its own, but it did not. *Id.* "She *then* proceeded to notice that certain arm movements were causing severe left shoulder pain." *Id.* (emphasis added). When this happened, the pain was "sudden and intense." *Id.* at 9-10. Her PCP noted that the petitioner could not "adduct her L shoulder/arm and she cannot externally rotate the L shoulder." *Id.* at 10. Petitioner was referred to an orthopedic surgeon for evaluation. *Id.*

Two days later (February 4, 2021), Petitioner saw orthopedist Dr. J. Michael Wiater complaining of a four-month history of left shoulder pain. Ex. 3 at 12-13. Petitioner related her pain to a flu vaccine received "4-5 months ago." *Id.* at 14. On examination, her left shoulder exhibited reduced range of motion ("ROM") compared to her right shoulder and positive results on the O'Brien's, Neer's, Hawkin's, and Speed's tests. *Id.* Dr. Wiater diagnosed Petitioner with left shoulder adhesive capsulitis/inflammation and prescribed an anti-inflammatory medication and physical therapy ("PT"). *Id.*

Petitioner underwent a PT evaluation the following week (February 12, 2021). Ex. 4 at 102. This record states that she received a flu vaccine in *December* (rather than October) and "immediately had deep pain for about 2 months." *Id.* "[A]fter the pain wore off, she noticed that she had decreased mobility and strength in L shoulder joint." *Id.* She now had pain only with certain movements, although it was somewhat unpredictable which movements would result in pain. *Id.* She rated her pain five out of ten, ranging from zero at best to eight at worst. *Id.* at 115. On examination, her left shoulder active ROM was 120 degrees in flexion, 100 degrees in abduction, 50 degrees in extension, 50 degrees in internal rotation, and 60 degrees in external rotation.[3] *Id.* at 102.

---

[3] Normal shoulder ROM for adults ranges from 165 to 180 degrees in flexion, 170 to 180 degrees in abduction, 50 to 60 degrees in extension, 90 to 100 degrees in external rotation, and 70 to 90 degrees in

Petitioner returned to her PCP on March 16, 2021, for an annual exam. Ex. 2 at 4. This record states that she received a flu vaccine in October 2020 "and had pain 1 month after." *Id*. She had started PT and felt that she was regaining ROM, but still had pain. *Id*. at 4. Her PCP recommended that she continue PT and follow up with Dr. Wiater for an MRI if she did not improve. *Id*. at 9.

Petitioner completed a total of 11 PT sessions between February 12, 2021 and March 26, 2021. Ex. 4 at 97-104. By March 12th, she reported no pain, and her active ROM had improved to 165 degrees in flexion and 160 degrees in abduction. *Id*. at 84. When she was discharged on March 26th, she was noted to have "[r]ecovered in full" and met her functional treatment goals. *Id*. at 75. On April 2, and April 23 2021, Petitioner received COVID-19 vaccines in her left deltoid. Ex. 10 at 21-22.

Petitioner underwent a left shoulder MRI on April 20, 2021. Ex. 6 at 17; Ex. 15 at 3. The MRI revealed fluid in the subcoracoid bursa, evidence of edema, a small joint effusion, and glenoid cartilage thinning. *Id*.

Two days later (April 22, 2021), Petitioner saw the orthopedist via telehealth to review the MRI. Ex. 3 at 10. Dr. Wiater interpreted the MRI as showing "subacromial bursitis" and "evidence of adhesive capsulitis with capsular thickening." *Id*. at 11. They discussed treatment options, including a steroid injection or surgery. Petitioner opted for a steroid injection, which was administered in her left shoulder the following week (April 29, 2021). *Id*. at 8.

On June 7, 2021, Petitioner saw orthopedist Dr. John Samani for evaluation of her left shoulder pain. Ex. 5 at 16. She complained of pain that began on October 12, 2020 when she received a flu vaccine. *Id*. She woke up the next morning with pain near the injection site at the top of her shoulder. *Id*. Her pain ranged from zero to seven out of ten, with a constant dull ache and limited ROM. *Id*. The cortisone injection she received in April provided some symptom relief, but her pain persisted. *Id*. On examination, her left shoulder passive ROM was 80 degrees in flexion and 20 degrees in extension, internal rotation, and external rotation. *Id*. at 17.

Dr. Samani proposed that Petitioner had adhesive capsulitis, impingement syndrome, bursitis, and pain of the left shoulder. Ex. 5 at 19. He recommended a manipulation under anesthesia followed by aggressive PT. *Id*. at 20. Petitioner agreed, and on July 13, 2021 she underwent left shoulder arthroscopic decompression, arthroscopic distal clavicle excision, lysis and resection of adhesions with manipulation under anesthesia, extensive debridement, and complete synovectomy. *Id*. at 29, 38.

Petitioner began post-operative PT the day after surgery, July 14, 2021. Ex. 4 at 68. She rated her pain as two out of ten, ranging to seven out of ten at worst. *Id*. at 68,

---

internal rotation. Cynthia C. Norkin and D. Joyce White, MEASUREMENT OF JOINT MOTION: A GUIDE TO GONIOMETRY 72, 76, 80, 84, 88 (F. A. Davis Co., 5th ed. 2016).

3

112. Her left shoulder active ROM was 90 degrees in flexion, 50 degrees in abduction, and 40 degrees in internal rotation and external rotation. *Id.* at 68. After the first few PT sessions, her pain had decreased, but she continued to have limited ROM. *Id.* at 59, 61. After two months of PT, however, her ROM was close to or within normal ranges, with 180 degrees in flexion, 150 degrees in abduction, 60 degrees in extension, 55 degrees in internal rotation, and 85 degrees in external rotation. *Id.* at 24. Petitioner attended a total of 21 post-operative PT sessions between July 14 and October 8, 2021. *Id.* at 11-70.

Petitioner followed up with Dr. Samani on October 27, 2021. Ex. 6 at 13. She had completed PT and her pain was now two out of ten. *Id.* Her left shoulder active ROM was 160 degrees in flexion, 100 degrees in abduction, and 60 degrees in external rotation. *Id.* at 14. Petitioner was advised to continue with home exercises and follow up as needed. *Id.* at 15.

### B. Declarations

Petitioner has submitted five declarations in support of her claim - two on her own behalf and three from others. Exs. 7, 20, 23, 24, 25. The morning after vaccination, Petitioner recalls being "instantly aware that there was something wrong with my arm." Ex. 25 at ¶ 4. The pain was atypical and "above and beyond" the usual pain from a vaccination, radiating from the top of her shoulder to her elbow. *Id.* This pain continued for about four to six weeks. *Id.* at ¶ 5. She self-treated with ibuprofen, topical gels, rest, and magnesium bath soaks. *Id.* Petitioner explains that her health coverage requires her to have a wellness exam every year, but other than that if she has any problems she self-treats, and this approach has worked for her for the most part. *Id.* at ¶ 10.

After approximately six weeks, the pain Petitioner had been feeling seemed to subside, but she realized that certain movements caused "sudden, excruciating pain." Ex. 25 at ¶ 7. She does not recall the exact date when this shift occurred, but it was before December 5, 2020. *Id.* at ¶ 8. On that day, she recalls taking her dog to the groomer; she was holding the leash in her right hand and felt "breathtaking pain" when she used her left hand to reach for the car door handle. *Id.* As time went on, even slight movements caused pain, and she felt persistent aching throughout the day. *Id.* at ¶ 9. By the end of January 2021, Petitioner was "in distress" and contacted her PCP for an appointment. *Id.* at ¶¶ 10, 11.

Petitioner also has stated that her first round of PT was "painful and plentiful," but she regained some movement in her arm. *Id.* at ¶ 12. However, her pain did not go away. *Id.* The steroid injection took the edge off, but the relief was short-lived. *Id.* at ¶ 14. She then consulted a different orthopedist, who recommended surgery. *Id.*

Due to COVID-19 restrictions, Petitioner was alone for the surgery, with her husband waiting in the car. Ex. 25 at ¶ 15. She describes the day of surgery and the next day as "horrific," explaining that the pain she had felt before surgery "paled in comparison to what I experienced after." *Id.* at ¶¶ 15, 16. She had a reaction to anesthesia, resulting

4

in "the worse nausea and vomiting I have ever experienced." *Id*. She began PT the day after surgery, and the first several sessions were "excruciating." *Id*. at ¶ 17. The therapist forced her arm into movement, resulting in "audible crunching noises and terrible pain." *Id*. For several months after surgery she was in pain that would not go away, and she worried she would never be pain-free again. *Id*. at ¶ 18.

By October 2021, however, the pain finally subsided, and by the end of 2021 Petitioner "felt like a normal-ish person again." Ex. 25 at ¶ 20. As of March 2024 (when she signed her supplemental declaration), most of the time she does not think about her shoulder, although at times she has lingering issues. *Id*. at ¶ 21. Sometimes specific rigorous activities leave her with left shoulder pain she rates as three or four, which she treats with ice, ibuprofen, and rest. *Id*. The overall experience was "an exasperating burden." *Id*. at ¶ 23. What pains her the most is the time she lost playing with her youngest child, who was still at an age where he wanted to play with her at the time of her injury. *Id*. at ¶ 24.

Julie Hodgson, a neighbor who has known Petitioner for about ten years, submitted a declaration in support of the claim. Ex. 20. Ms. Hodgson recalls a conversation with Petitioner in October or early November 2020 when Petitioner complained that her shoulder hurt immediately after receiving the flu vaccine. *Id*. at ¶ 2. Although Ms. Hodgson cannot recall the exact date of this conversation, she recalls it occurring before she became ill with COVID in mid-November 2020. *Id*. at ¶ 3. After Ms. Hodgson recovered from COVID she went for a walk with Petitioner, who said her arm was still "very painful." *Id*.

Petitioner's husband, Patrick Sharrak, submitted a declaration in support of her claim. Ex. 23. Mr. Sharrak states that he and Petitioner received flu vaccines together late in the evening on the same day, and went to bed soon after returning home. *Id*. at ¶ 2. The next morning, Petitioner asked if his arm was okay, explaining that her arm was "screwed up, something is not right." *Id*. at ¶ 3.

Petitioner's sister, Krisanna Kulak, submitted a declaration in support of the claim. Ex. 24. Ms. Kulak lives two houses away from Petitioner, and they speak daily. *Id*. at ¶ 1. In October 2020, Petitioner told Ms. Kulak that she had received a vaccine a few days prior, and her arm was unusually painful. *Id*. at ¶ 2. Ms. Kulak gave Petitioner a topical anesthetic and recommended that she seek medical attention, but Petitioner "was confident it would get better over time." *Id*. at ¶¶ 3, 4. However, one night in January, Petitioner came to Ms. Kulak crying because the pain was unbearable, and at that point Petitioner finally agreed to see her doctor. *Id*. at ¶ 5.

## II.   Factual Findings and Ruling on Entitlement

### A.   Legal Standards

Before compensation can be awarded under the Vaccine Act, a petitioner must preponderantly demonstrate all matters required under Section 11(c)(1), including the factual circumstances surrounding his or her claim. Section 13(a)(1)(A). In making this determination, the special master or court should consider the record as a whole. Section 13(a)(1). Petitioner's allegations must be supported by medical records or by medical opinion. *Id.*

To resolve factual issues, the special master must weigh the evidence presented, which may include contemporaneous medical records and testimony. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415, 417 (Fed. Cir. 1993) (explaining that a special master must decide what weight to give evidence including oral testimony and contemporaneous medical records). "Medical records, in general, warrant consideration as trustworthy evidence.  The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

To overcome the presumptive accuracy of medical records testimony, a petitioner may present testimony which is "consistent, clear, cogent, and compelling." *Sanchez v. Sec'y of Health & Human Servs.,* No. 11–685V, 2013 WL 1880825, at *3 (Fed. Cl. Spec. Mstr. Apr. 10, 2013) (citing *Blutstein v. Sec'y of Health & Human Servs.,* No. 90–2808V, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998)). The Federal Circuit has "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Human Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021) (explaining that a patient may not report every ailment, or a physician may enter information incorrectly or not record everything he or she observes).

In addition to requirements concerning the vaccination received and the lack of other award or settlement,[4] a petitioner must establish that he or she suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination he or she received. Section 11(c)(1)(C). The Vaccine Act further includes a "severity requirement," pursuant to which a petitioner demonstrate that they "suffered the residual effects or complications of such illness, disability, injury,

---

[4] In summary, a petitioner must establish that he received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception and has not filed a civil suit or collected an award or settlement for his or her injury. Section 11(c)(1)(A)(B)(E).

or condition for more than 6 months after the administration of the vaccine . . . ." Section 11(c)(1)(D).

"[T]he fact that a Petitioner has been discharged from medical care does not necessarily indicate that there are no remaining or residual effects from her alleged injury." *Morine v. Sec'y of Health & Human Servs.*, No. 17-1013, 2019 WL 978825, at *4 (Fed. Cl. Spec. Mstr. Jan. 23, 2019); *see also Herren v. Sec'y of Health & Human Servs.*, No. 13-1000V, 2014 WL 3889070, at *3 (Fed. Cl. Spec. Mstr. July 18, 2014) ("a discharge from medical care does not necessarily indicate there are no residual effects"). "A treatment gap . . . does not automatically mean severity cannot be established." *Law v. Sec'y of Health & Human Servs.*, No. 21-0699V, 2023 WL 2641502, at *5 (Fed. Cl. Spec. Mstr. Feb. 23, 2023) (finding severity requirement met where Petitioner sought care for under three months and had met physical therapy goals but still lacked full range of motion and experienced difficulty with certain activities, then returned to care nearly five months later reporting stiffness and continuing restrictions in motion); *see also Peeples v. Sec'y of Health & Human Servs.*, No. 20-0634V, 2022 WL 2387749 (Fed. Cl. Spec. Mstr. May 26, 2022) (finding severity requirement met where Petitioner sought care for four months, followed by fifteen month gap); *Silvestri v. Sec'y of Health & Human Servs.*, No. 19-1045V, 2021 WL 4205313 (Fed. Cl. Spec. Mstr. Aug. 16, 2021) (finding severity requirement satisfied where Petitioner did not seek additional treatment after the five month mark.

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of a flu vaccine. 42 C.F. R. § 100.3(a)(XIV)(B). The criteria establishing a SIRVA under the accompanying Qualifications and Aids to Interpretation ("QAI") are as follows:

> Shoulder injury related to vaccine administration (SIRVA). SIRVA manifests as shoulder pain and limited range of motion occurring after the administration of a vaccine intended for intramuscular administration in the upper arm. These symptoms are thought to occur as a result of unintended injection of vaccine antigen or trauma from the needle into and around the underlying bursa of the shoulder resulting in an inflammatory reaction. SIRVA is caused by an injury to the musculoskeletal structures of the shoulder (e.g. tendons, ligaments, bursae, etc.). SIRVA is not a neurological injury and abnormalities on neurological examination or nerve conduction studies (NCS) and/or electromyographic (EMG) studies would not support SIRVA as a diagnosis (even if the condition causing the neurological abnormality is not known). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

>  (i) No history of pain, inflammation or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;
>
>  (ii) Pain occurs within the specified time-frame;
>
>  (iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and
>
>  (iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

### B. Parties' Arguments on Entitlement

The only dispute relating to entitlement is whether Petitioner can establish that her shoulder pain began within 48 hours of vaccination, as required for a Table SIRVA claim. Petitioner asserts that although she first reported shoulder pain three months and three weeks after vaccination, at that time she "definitively linked the onset of her pain to vaccination," noting a progression of symptoms in the ensuing timeframe. Petitioner's Motion for Ruling on the Record, filed Mar. 22, 2024, at *8 (ECF No. 28) ("Mot."). And the witness statements filed in the matter corroborate that the onset of her pain was within 48 hours of vaccination. *Id.*

Respondent argues that Petitioner did not seek care until nearly four months after vaccination, at which point she reported pain lasting only one and a half months – suggesting that her pain began over two months after vaccination. Respondent's Rule 4(c) Report and Response, filed June 1, 2024, at *6 (ECF No. 31) ("Resp."). And when seeking care, Petitioner inconsistently reported the duration of her pain. Thus, she reported a month and a half history of pain to her PCP, but two days later told her orthopedist she had been in pain for four months. Resp. at *6. And eight days after that, she reported to the physical therapist two months of pain "since December 2020." *Id.* Furthermore, Petitioner was seen at urgent care six weeks after vaccination and did not mention shoulder pain. Resp. at *6. And the nearly four-month gap between vaccination and her first treatment compounds the inconsistency in her reports as to when her pain

8

began. *Id.* Respondent argues that Petitioner's declarations should be given little weight because they were made in the context of litigation over two years after vaccination. *Id.*

### C. Factual Findings on Onset

I find that the record preponderantly supports the conclusion that Petitioner's shoulder pain likely began within 48 hours of vaccination. Although Petitioner delayed seeking care for several months, I have previously stated that this is not uncommon for SIRVA claimants, who hope that the pain will resolve on its own. *Tully v. Sec'y of Health & Human Servs.*, No. 21-1998V, 2024 WL 4533515 (Fed. Cl. Spec. Mstr. Sept. 20, 2024) (finding onset occurred within 48 hours although claimant did not seek care for two and a half months); *Diaz v. Sec'y of Health & Human Servs.*, 20-1003V, 2023 WL 8440873, at *6 (Fed. Cl. Spec. Mstr. Nov. 1, 2023) (finding onset was within 48 hours where the petitioner delayed seeking care for over three months after vaccination); *Buck v. Sec'y of Health & Human Servs.*, No. 19-1301V, 2023 WL 6213423, at *7 (Fed. Cl. Spec. Mstr. Aug. 23, 2023) (finding onset of pain occurred within 48 hours where the petitioner did not seek care for over three months and noting that a delay in seeking care is relevant to onset, but not dispositive).

In addition, when seeking treatment Petitioner consistently related her pain to vaccination. Ex. 2 at 9; Ex. 3 at 12-13; Ex. 4 at 102; Ex. 5 at 16. When she first saw Dr. Wiater almost four months after vaccination, she complained of a four-month history of shoulder pain. Ex. 3 at 12-13. And she told Dr. Samani that she woke up the morning after vaccination with shoulder pain. Ex. 5 at 16.

Admittedly, the language Petitioner used in describing when her pain began was somewhat unclear, and lends itself to different interpretations. For instance, when she first sought care, she related her pain to her October vaccination, but also reported "pain for 1.5 months," and then noticed that "certain arm movements were causing severe left shoulder pain." Ex. 2 at 4. Respondent interprets this language to suggest that her pain began a month and a half before this appointment – which would be approximately two months after vaccination.

Respondent's construction of this language, while not unreasonable, is not wholly compelling for purposes of determining onset. The Act does not require a claimant to feel SIRVA pain *continuously*,[5] and it does not undermine a favorable onset finding for a claimant to have immediate pain and related symptoms that subsequently evolve (although they must *primarily* if not exclusively be confined to the affected shoulder). Petitioner's language describing the onset of her pain at her initial PCP appointment (Ex. 2 at 4) and her first PT evaluation (Ex. 4 at 102) is best understood as describing an injury course with two phases: an initial phase of deep and relatively constant pain, followed by a secondary phase where the pain seemed to occur only with certain movements, but

---

[5] Of course, petitioners must prove six months of injury sequelae, but that is not the same as requiring them to prove constant and unrelenting pain for that timeframe.

was sudden and intense on those occasions. Thus, Petitioner's reporting to her PCP on February 2nd that she had been experiencing a month and a half of pain is consistent with a progression in her symptoms - more or less continuous, deep pain for a month and a half after vaccination, *followed by* a couple of months preceding the later appointment where her pain occurred only with certain movements.

Similarly, the PT evaluation describes an initial phase of about two months of deep pain, followed by pain only with certain movements. I acknowledge that the PT record incorrectly states that the flu vaccine was administered in December – but even so, Petitioner related her pain *to vaccination*.

This interpretation is also consistent with Petitioner's initial orthopedic appointment (describing a four month history of shoulder pain). And it is supported by testimonial evidence. Ex. 25 at ¶¶ 5-7 (describing an initial pain phase of four to six weeks in the beginning, followed by that pain subsiding but noticing that at that point, she experienced sudden, excruciating pain with certain movements).

Earlier records do not undermine this onset determination. Although Petitioner did not complain of shoulder pain at her urgent care encounter in November 2020, that visit was for COVID testing. Ex. 12 at 8. Indeed, the record itself states the visit was for COVID testing, suggesting that it would have been unexpected to seek care for a shoulder injury at the same encounter. As such, I find that Petitioner's failure to complain of shoulder pain at this visit does not undermine a finding that she was experiencing pain at that time.

Only one record possibly provides greater evidence of a non-Table onset. Specifically, Petitioner's annual examination record states that she received a flu vaccine in October, and then had pain "1 month after." Ex. 2 at 4. This could mean she had pain *beginning* one month after vaccination, and therefore adds some uncertainty as to when the onset of Petitioner's pain occurred. But the aforementioned evidence, considered in its totality, still preponderates in favor of Table onset.

### D. Factual Findings on Remaining SIRVA QAI Criteria and Statutory Requirements

The remaining QAI and statutory requirements are not contested, and I find that they are preponderantly satisfied. The record does not contain preponderant evidence that Petitioner had a history of left shoulder pain or any other condition that would explain her post-vaccination symptoms. Ex. 2. She exhibited reduced ROM, and her pain and ROM limitations were limited to her vaccinated left shoulder. Exs. 2, 3, 4.

The statutory requirements applicable to all claims are also preponderantly established. Petitioner received a covered vaccine in the United States. Ex. 1 at 3. She experienced residual effects of her injury for more than six months. Ex. 5 at 16. And she states she has never received an award or settlement for her vaccine injuries, nor has she filed a civil action. Ex. 7 at ¶ 6. Thus, Petitioner is entitled to compensation.

### III. Damages

#### A. Legal Standard

In another recent decision, I discussed at length the legal standard to be considered in determining damages and prior SIRVA compensation within SPU. I fully adopt and hereby incorporate my prior discussion in Section I-II of *Timberlake v. Sec'y of Health & Human Servs.*, No. 20-1905V, 2025 WL 721730 (Fed. Cl. Spec. Mstr. Feb. 19, 2025).

In sum, compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000.00," in addition to certain unreimbursable expenses resulting from the vaccine-related injury. Section 15(a)(1), (a)(4). The petitioner bears the burden of proof with respect to each element of compensation requested. *Brewer v. Sec'y of Health & Human Servs.*, No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996). Factors to be considered when determining an award for pain and suffering include: 1) awareness of the injury; 2) severity of the injury; and 3) duration of the suffering.[6]

#### B. Parties' Damages Arguments

Petitioner seeks an award of $145,000.00 for pain and suffering. Mot. at *12. She cites *Wilson*, *Blanco*, and *Cates*,[7] involving pain and suffering awards of $130,000.00, $135,000.00, and $108,000.00, respectively, in support of her proposed award. *Id.* at *10-11. Petitioner emphasizes that she attended 32 PT sessions, received a steroid injection, and underwent invasive and comprehensive arthroscopic surgery with a long and painful recovery. *Id.* at *11. She also argues that this case may look like *Wilson* or *Blanco*, but that she had aggravating circumstances that made her case more severe, including loss of time playing with her son, having to experience pre-surgery anxiety and post-surgery pain and stress alone, and a long and painful post-surgical recovery. Mot. at *11. She therefore requests a higher award.

Respondent does not provide a proposed award, stating that he "has determined that his recommendation of a specific number has not assisted the special masters in

---

[6] *I.D. v. Sec'y of Health & Human Servs.*, No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) (quoting *McAllister v. Sec'y of Health & Human Servs.,* No 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), *vacated and remanded on other grounds*, 70 F.3d 1240 (Fed. Cir. 1995)).

[7] *Wilson v. Sec'y of Health & Human Servs.*, No. 19-0035V, 2021 WL 1530731 (Fed. Cl. Spec. Mstr. Mar. 18, 2021); *Blanco v. Sec'y of Health & Human Servs.*, No. 18-1361V, 2020 WL 4523473 (Fed. Cl. Spec. Mstr. July 6, 2020); and *Cates v. Sec'y of Health & Human Servs.*, No.18-0277V, 2020 WL 3751072 (Fed. Cl. Spec. Mstr. June 5, 2020).

11

their determinations." Resp. at *9. However, he relies on *Hunt* ($95,000.00 pain and suffering award) and *Shelton* ($97,500.00 pain and suffering award), maintaining that Petitioner should be awarded less than the petitioners in those cases.[8] *Id.* at 12-13.

Although Petitioner underwent surgery, Respondent views her injury as a moderate SIRVA with a good recovery around one year after vaccination. Resp. at *9. Respondent emphasizes Petitioner's nearly four-month delay in seeking care and initial good response to PT, where she reported feeling "99% better" just over a month after starting PT before her surgery. *Id.* at *10 (citing Ex. 7 at 79). Ultimately, after surgery and 21 additional PT sessions, by one year after vaccination she reported only mild pain and ROM deficits. *Id.* In all, she actively treated for about eight and a half months. *Id.*

Respondent further emphasizes that in the cases Petitioner relies on, entitlement had already been determined, and asserts that these cases are not otherwise comparable. Resp. at *10. The *Wilson* petitioner presented for treatment just one month after vaccination, and recovered 11 months after vaccination but complained of residual symptoms for a few years afterward. *Id.* at *10-22. The *Blanco* petitioner had a relatively severe injury, seeking treatment less than a month after vaccination and treating for over two years, including four steroid injections. *Id.* at *11. And the *Cates* petitioner sought treatment just 11 days after vaccination. *Id.* Thus, Respondent asserts that Petitioner should receive less than was awarded in those cases.

In Respondent's view, even the $95,000.00 pain and suffering award in *Hunt* is not warranted in this case, because that petitioner received more extensive care than Ms. Sharrak. Resp. at *12. The *Hunt* petitioner first sought treatment just three weeks after vaccination, received two cortisone injections, and underwent surgery and attended ten PT sessions. *Id.* And the *Hunt* petitioner returned for additional treatment, including cortisone injections, over 17 months after surgery. *Id.* The *Shelton* petitioner delayed seeking care for five months – longer than Ms. Sharrak – but thereafter sought "more consistent care" over a 15-month period – much longer than Ms. Sharrak – that included three steroid injections and pre-and post-surgical PT. *Id.* at *13. Respondent concludes that I should award an amount that is "consistent with the evidence presented." *Id.* at *14.

### C. Appropriate Compensation for Pain and Suffering

Petitioner had a moderate injury, with significant ROM restrictions at times. She underwent surgery and a steroid injection, in addition to PT both before and after surgery. Initially she did not seek treatment for nearly four months, but thereafter consistently sought care until approximately one year after vaccination. At that time, her ROM had

---

[8] *Hunt v. Sec'y of Health & Human Servs.*, No.19-1003V, 2022 WL 2826662 (Fed. Cl. Spec. Mstr June 16, 2022); *Shelton v. Sec'y of Health & Human Servs.*, No.19-279V, 2021 WL 2550093 (Fed. Cl. Spec. Mstr. May 21, 2021).

improved, but she still had some residual pain. She had a reaction to anesthesia, and due to COVID restrictions she was alone during surgery.

Of the cases the parties cite, I find *Shelton* to be the most comparable. Both the *Shelton* petitioner and Ms. Sharrak delayed seeking care for several months, with Ms. Sharrak seeking treatment sooner. I acknowledge that different individuals have varying pain tolerance, circumstances, and thresholds for seeking medical care. While Petitioner's treatment delay does not defeat her claim entirely, it is highly relevant to damages, suggesting that her injury was less severe and that she was able to manage it on her own for several months. This speaks directly to the extent of her pain and suffering.

The *Shelton* petitioner had a longer treatment course and received more steroid injections – but had a four-month gap during treatment in addition to a longer initial treatment delay, and attended less PT. On balance, I find that Petitioner should receive a slightly higher award than the *Shelton* petitioner.

Of the cases Petitioner cites, *Cates* is the most similar. However, that claimant sought care *much* sooner, just 11 days after vaccination (compared to 113 days for Petitioner), which suggests that individual experienced more severe symptoms. The *Wilson* and *Blanco* petitioners also sought care much sooner than Ms. Sharrak, and had longer injury courses. As such, those cases are not comparable.

**Conclusion**

For all of the reasons discussed above and based on consideration of the record as a whole, **I GRANT Petitioner's motion for a ruling on the record, and find that Petitioner suffered an injury that meets the definition for a Table SIRVA and is entitled to compensation. I find that $100,000.00 represents a fair and appropriate amount of compensation for Petitioner's actual pain and suffering.[9] I also find that Petitioner is entitled to $570.00 in actual unreimbursable expenses.[10]**

Based on the record as a whole and arguments of the parties, **I award Petitioner a lump sum payment of $100,570.00 to be paid through an ACH deposit to Petitioner's counsel's IOLTA account for prompt disbursement to Petitioner.** This

---

[9] Since this amount is being awarded for actual, rather than projected, pain and suffering, no reduction to net present value is required. *See* Section 15(f)(4)(A); *Childers v. Sec'y of Health & Human Servs.*, No. 96-0194V, 1999 WL 159844, at *1 (Fed. Cl. Spec. Mstr. Mar. 5, 1999) (citing *Youngblood v. Sec'y of Health & Human Servs.*, 32 F.3d 552 (Fed. Cir. 1994)).

[10] The parties agree that Petitioner is entitled to reimbursement of $570.00 in unreimbursable expenses. Mot. at *12; Resp. at *13.

amount represents compensation for all damages that would be available under Section 15(a).

The Clerk of Court is directed to enter judgment in accordance with this Decision.[11]

**IT IS SO ORDERED.**

<u>**s/Brian H. Corcoran**</u>
Brian H. Corcoran
Chief Special Master

---

[11] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by the parties' joint filing of notice renouncing the right to seek review.